IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-650

Filed 2 April 2025

Durham County, No. 19CRS051759

STATE OF NORTH CAROLINA

v.

SHAJUAN DWATRAY ERVIN

Appeal by Defendant from judgment entered 22 November 2022 by Judge James E. Hardin Jr. in Durham County Superior Court. Heard in the Court of Appeals 12 February 2025.

*Attorney General Jeff Jackson, by Special Deputy Attorney General Robert C. Montgomery, for the State-Appellee.*

*William D. Spence for Defendant-Appellant.*

COLLINS, Judge.

Defendant Shajuan Dwatray Ervin appeals from a judgment entered upon a jury's guilty verdict of first-degree murder. Defendant argues that the trial court erred by denying his motion to dismiss the charge of first-degree murder, admitting testimony of several of his prior violent acts, overruling his objection to the State's closing argument, and excluding evidence surrounding the victim's alleged gang involvement. For the following reasons, we find no error.

## I. Background

Defendant was charged with first-degree murder for a shooting that occurred in the early morning hours of 19 March 2019. The State's evidence at trial tended to show the following:

Defendant lived in a three-story townhouse in Durham, North Carolina with the following individuals: Defendant's girlfriend, Akira Jackson; Defendant and Akira's six-month-old child; Akira's brother, Marcus Jackson; Marcus' girlfriend, Kayla Tripp; and Defendant's sister, Domilege Hunter.

Several months before the shooting, Akira learned that another woman was pregnant with Defendant's child. This news caused tension between Defendant and Akira and between Defendant and Marcus. Two weeks before the shooting, Defendant and Akira got into a physical altercation during which Defendant punched Akira repeatedly in the thigh. After this incident, Defendant began sleeping on the first floor of the townhouse on an air mattress.

On the morning of 18 March 2019, Akira called her mother, Nicole Elliott, to talk about her relationship with Defendant. Concerned for her daughter, Elliott suggested that Defendant move out of the townhouse. Defendant, listening to the conversation on speakerphone, began yelling and cursing at Elliott and Akira. Later that day, Marcus learned of Defendant's outburst.

When Defendant arrived home from work later that evening, Marcus confronted Defendant. Defendant and Marcus were on the first floor; Akira, her baby,

Tripp, and Hunter were all upstairs in their respective bedrooms. At some point, the confrontation between Defendant and Marcus became physical. Tripp, in her room on the second floor, heard "yelling" and "backs hitting the wall" coming from the first floor. Akira also heard the commotion and ran downstairs. She found Defendant on top of Marcus, pinning him to the ground. Marcus explained that he had confronted Defendant about Defendant's disrespect of Elliott.

After Akira convinced Defendant to get off Marcus, Akira and Marcus walked upstairs to Marcus' room for a short time before walking outside. A few minutes later, Defendant went to Hunter's room, carrying his baby and the gun he owned. He gave Hunter the baby and told her that Marcus had "jumped on him." According to Hunter, Defendant had scratches and blood on his face.

While standing outside in front of the townhouse, Marcus texted Defendant, "Backyard, let me get my one." Defendant immediately responded, "You brave, come on in." A few minutes later, Marcus again texted Defendant, "Out here," and Defendant responded, "Come on in, you brave." Marcus then walked around the townhouse and stood directly outside the back door.

Akira walked inside and went into Hunter's room. She got her baby from Hunter and, as she walked out of the room, saw Defendant walking behind her with a gun in his hands. Defendant was yelling for Marcus. Tripp heard the yelling and walked out of her room to find Defendant and Akira standing in the hallway. Akira and Tripp tried to stop Defendant from going downstairs with the gun, to no avail.

Tripp attempted to block Defendant by standing in between him and the stairwell, but Defendant pushed her down the stairs. At this point, Akira called the police.

Once downstairs, Tripp saw Marcus standing near the sliding doors at the back of the townhouse. Defendant initially walked toward the front door, but he quickly turned around and walked through the kitchen toward the back, shooting at Marcus as he walked. After Marcus fell face-down onto the floor, Defendant turned around and walked out the front door.

Upon arriving at the scene, Officer Cassen Bolick of the Durham Police Department found Defendant standing in the townhouse parking lot with his hands up. He told Officer Bolick that he had a firearm in his right pocket and ammunition in his left pocket. Officer Bolick immediately placed Defendant into custody. Defendant told law enforcement that Marcus had "jumped him," and when Defendant was asked about the blood on his clothes, Defendant said "[a]t least you know he was close." Defendant maintained that he shot Marcus in self-defense and that Marcus had told him, "I'm drunk, so if you going to kill me, you better kill me before I kill you."

Marcus had three gunshot wounds and was declared deceased shortly after being transported to the hospital. Two of Marcus' gunshot wounds had stippling, indicating that Defendant was less than three feet away from Marcus when he inflicted those wounds.

Defendant testified on his own behalf. According to Defendant, Marcus

attacked him because he had "disrespected" Marcus and Akira's mother. After their initial physical altercation, Defendant went upstairs to retrieve his gun because Marcus had threatened, "kill me before I kill you." As Defendant walked back downstairs, Tripp opened the front door and, in a matter of seconds, Marcus charged Defendant. Defendant testified, "He lunged out at me. And I don't know if he was trying to, you know, grab the gun, grab me, whatever, but I shot him." According to Defendant, he was still standing on the stairs when he shot Marcus.

The jury convicted Defendant of first-degree murder, and the trial court sentenced Defendant to life imprisonment without the possibility of parole. Defendant appeals.

## II.    Discussion

### A. Defendant's Motion to Dismiss

Defendant first argues that the trial court erred by denying his motion to dismiss the charge of first-degree murder because the State failed to present sufficient evidence that Defendant acted with premeditation and deliberation when he shot and killed Marcus.

Upon a defendant's motion to dismiss, the trial court must determine "whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense." *State v. Fritsch*, 351 N.C. 373, 378 (2000) (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78-79 (1980)

(citations omitted).

> In reviewing challenges to the sufficiency of evidence, we must view the evidence in the light most favorable to the State, giving the State the benefit of all reasonable inferences. Contradictions and discrepancies do not warrant dismissal of the case but are for the jury to resolve. The test for sufficiency of the evidence is the same whether the evidence is direct or circumstantial or both. Circumstantial evidence may withstand a motion to dismiss and support a conviction even when the evidence does not rule out every hypothesis of innocence. If the evidence presented is circumstantial, the court must consider whether a reasonable inference of defendant's guilt may be drawn from the circumstances.

*State v. Ingram*, 283 N.C. App. 85, 88 (2022) (citation omitted).

"First-degree murder is the intentional and unlawful killing of a human being

with malice and premeditation and deliberation." *State v. Leazer*, 353 N.C. 234, 237

(2000) (citation omitted). "Premeditation means that the act was thought over

beforehand for some length of time, however short." *Id.* at 238 (quotation marks and

citation omitted). "Deliberation means an intent to kill, carried out in a cool state of

blood, in furtherance of a fixed design for revenge or to accomplish an unlawful

purpose and not under the influence of a violent passion, suddenly aroused by legal

provocation or lawful or just cause." *State v. Thomas*, 350 N.C. 315, 347 (1999)

(citation omitted).

Premeditation and deliberation are often proved by circumstantial evidence.

*State v. Taylor*, 362 N.C. 514, 531 (2008). Evidence that the defendant entered the

site of the murder with a deadly weapon, for example, supports an inference of premeditation and deliberation because such evidence "indicates the defendant anticipated a confrontation and was prepared to use deadly force to resolve it[.]" *Id.* (citations omitted); *see, e.g., Leazer*, 353 N.C. at 239. Premeditation and deliberation can also be shown through evidence that the defendant "fir[ed] multiple shots, because some amount of time, however brief, for thought and deliberation must elapse between each pull of the trigger[.]" *Taylor*, 362 N.C. at 531 (quotation marks and citations omitted); *see State v. Austin*, 320 N.C. 276, 295 (1987) ("[T]he premise of the 'felled victim' theory of premeditation and deliberation is that when numerous wounds are inflicted, the defendant has the opportunity to premeditate and deliberate from one shot to the next.").

Here, the evidence presented, viewed in the light most favorable to the State, is sufficient as to the challenged elements of premeditation and deliberation. Although Marcus and Defendant engaged in a physical altercation the night of the shooting, Defendant walked away from this fight on his own accord. He walked up two flights of stairs, retrieved his gun, walked down to the second floor, talked with his sister for a period of time, and then walked back down to the first floor. This evidence shows that Defendant anticipated another confrontation with Marcus and "had given some forethought to how he would resolve that confrontation." *State v. Ginyard*, 334 N.C. 155, 159 (1993).

The evidence also shows that Defendant inflicted multiple gunshot wounds on

Marcus. Regardless of Defendant's intent when he fired his first shot, there was adequate time between each shot for Defendant to think through his actions. *See Austin*, 320 N.C. at 295 (noting that even though a gun "is capable of being fired rapidly, some amount of time, however brief, for thought and deliberation must elapse between each pull of the trigger"). When viewed in the light most favorable to the State, this evidence indicates that Defendant had thought through his actions before retrieving the gun and intentionally using deadly force. Thus, there was sufficient evidence of premeditation and deliberation.

Defendant also argues that the State failed to present sufficient evidence that Defendant did not act in self-defense. This argument is meritless. Evidence was presented showing that when Defendant arrived on the first floor, Marcus did not charge him; rather, Defendant began walking toward the front door, turned around, and shot Marcus as Defendant walked through the house toward the back door, where Marcus was standing. Although Defendant offered a somewhat conflicting account of what occurred and indicated that he acted in self-defense, "contradictions in the evidence remain for the jurors to resolve." *State v. Revels*, 153 N.C. App. 163, 168 (2002) (citation omitted).

Accordingly, as the State presented sufficient evidence of each essential element of first-degree murder, the trial court did not err by denying Defendant's motion to dismiss the charge.

## B. Evidence of Defendant's Prior Violent Behavior

Defendant next argues that the trial court erred by admitting testimony of his prior violent behavior because the admission of the evidence violated Rules of Evidence 401, 402, 403, and 404(b). Specifically, Defendant objects to Akira's testimony regarding three prior incidents where Defendant was violent toward her.

### 1. Rules 401 and 402

Rules 401 and 402 govern the relevancy of evidence. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401 (2023). All relevant evidence is admissible so long as it comports with the United States Constitution, the North Carolina Constitution, Acts by the United States Congress, Acts by the North Carolina General Assembly, and any other rules of evidence. N.C. Gen. Stat. § 8C-1, Rule 402 (2023). "Evidence which is not relevant is not admissible." *Id.*

> [I]n a criminal case every circumstance calculated to throw any light upon the supposed crime is admissible and permissible. It is not required that evidence bear directly on the question in issue, and evidence is competent and relevant if it is one of the circumstances surrounding the parties, and necessary to be known, to properly understand their conduct or motives, or if it reasonably allows the jury to draw an inference as to a disputed fact.

*State v. Riddick*, 316 N.C. 127, 137 (1986) (citation omitted).

This Court "review[s] relevancy determinations by the trial court de novo . . . ." *State v. Triplett*, 368 N.C. 172, 175 (2015). "Although the trial court's rulings on relevancy technically are not discretionary . . . , such rulings are given great deference on appeal." *State v. Davis*, 237 N.C. App. 481, 485 (2014) (citation omitted).

Here, Defendant challenges Akira's testimony regarding three incidents: In the first incident, Defendant cornered Akira against a wall and repeatedly punched her in the thigh. Akira called out to Marcus, who came to help. Defendant told Marcus, "I'll beat your ass," before walking out of the townhouse. In the second incident, which occurred several months before the shooting, Akira found Defendant in their bed with another woman and Akira hit him in the head. Defendant threatened Akira by placing his gun in his lap before telling her not to hit him again. In the third incident, Defendant threatened Akira by placing a gun to her head after she had upset him.

All three incidents involved Defendant's violence toward Akira, the victim's sister, when Defendant and Akira were living in the same home with Marcus. This evidence provides context as to "circumstances surrounding the parties" and the relationship between Defendant, Akira, and Marcus leading up to the shooting. *Riddick*, 316 N.C. at 137 (citation omitted). Accordingly, the trial court did not err by admitting this evidence under Rules 401 and 402.

### 2. *Rule 404(b)*

Defendant also contends that this challenged evidence constitutes

inadmissible character evidence and should have been excluded under Rule 404(b).

This Court reviews "de novo the legal conclusion that the evidence is, or is not, within the coverage of Rule 404(b)." *State v. Beckelheimer*, 366 N.C. 127, 130 (2012) (citations omitted). "Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *State v. Williams*, 362 N.C. 628, 632-33 (2008) (quotation marks and citation omitted).

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." N.C. Gen. Stat. § 8C-1, Rule 404(b) (2023). Such evidence may, however, "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident." *Id.*

"Rule 404(b) has three requirements for the admission of evidence. First, relevant evidence of the past acts by a defendant must have probative value beyond showing the defendant has the propensity or disposition to commit an offense of the nature of the crime charged." *State v. Jones*, 288 N.C. App. 175, 181 (2023) (quotation marks and citation omitted). Rule 404(b) is a rule of inclusion. *State v. Coffey*, 326 N.C. 268, 278-79 (1990). Even though some evidence of prior acts may tend to show a defendant's propensity to commit the charged crime, such evidence is admissible under Rule 404(b) so long as it is used for some other purpose. *State v. Bagley*, 321 N.C. 201, 206 (1987). For example, evidence of prior acts "may be admissible under Rule 404(b) if it establishes the chain of circumstances or context of the charged

crime." *State v. White*, 340 N.C. 264, 284 (1995) (citation omitted). "Such evidence is admissible if the evidence of other [acts] serves to enhance the natural development of the facts or is necessary to complete the story of the charged crime for the jury." *Id.* (citation omitted).

"Second, the past act must be similar enough to the charged crime to distinguish the acts from any generalized commission of the crime." *Jones*, 288 N.C. App. at 181 (quotation marks, brackets, and citation omitted). The similarities need not "rise to the level of the unique and bizarre;" rather, "prior acts are considered sufficiently similar under Rule 404(b) if there are some unusual facts present in both [acts] that would indicate that the same person committed them." *Id.* (quotation marks and citations omitted).

"Third, the past act must be temporally proximate to the presently charged act." *Id.* (citation omitted). "[R]emoteness in time is less significant when the prior conduct is used to show intent, motive, knowledge, or lack of accident; remoteness in time generally affects only the weight to be given such evidence, not its admissibility." *State v. Stager*, 329 N.C. 278, 307 (1991) (citation omitted).

Here, the trial court found this evidence to be admissible under Rule 404(b) to show "motive, opportunity to use the weapon in the subject of this action[, i]ntent, which is a necessary element of the crime charged in this case, and preparation to use the weapon that was used in this incident." We agree.

The evidence in question shows that in the weeks and months leading up to

the shooting, Defendant had been violent toward Akira. He had thrown car keys at her, punched her repeatedly in the leg, and threatened her on multiple occasions with his gun. During at least one of the instances, Akira called out to Marcus for help. This evidence, therefore, shows that Marcus, who lived under the same roof as Defendant and Akira, had become aware of the nature of Defendant and Akira's relationship and the problems involved. Not only does this evidence help establish "the chain of circumstances or context of the charged crime," but it indicates Defendant's motive and intent to kill Marcus. *White*, 340 N.C. at 284 (citation omitted); *see State v. White*, 349 N.C. 535, 552 (1998) (determining that the defendant's prior violent acts toward the victim's family member were admissible under Rule 404(b) because, even though it was not part of the crimes charged, it "pertained to the chain of events explaining the context, motive and set-up of the crime") (brackets and citation omitted); *see also State v. Blalock*, 77 N.C. App. 201, 204 (1985) (determining that the evidence of defendant's prior assaults on members of the victim's family was admissible under Rule 404(b) because it "was relevant and competent to show his intent or motive").

The evidence in question is also sufficiently similar and temporally proximate to the charged crime. All of the events testified to by Akira involved violent acts committed by Defendant, who committed the charged crime of first-degree murder. This evidence also demonstrates Defendant's prior use of his gun—the same gun he used to shoot and kill Marcus. Furthermore, these prior acts occurred not long before

the shooting.  Even so, any remoteness in time to the charged crime is less significant because the evidence of these prior acts was used in part to show Defendant's motive and intent to kill Marcus.  *See Stager*, 329 N.C. at 307.

Accordingly, all three requirements for evidence to be admissible under Rule 404(b) were met, and the trial court did not err by admitting the evidence of Defendant's prior violent acts toward Akira under Rule 404(b).

### 3.  *Rule 403*

Defendant further argues that the challenged evidence should have been excluded under Rule 403.  This Court reviews Rule 403 rulings for abuse of discretion, which "results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision."  *State v. Hennis*, 323 N.C. 279, 285 (1988) (citation omitted).

Rule 403 provides that otherwise relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  N.C. Gen. Stat. § 8C-1, Rule 403 (2023).   "While all evidence offered against a party involves some prejudicial effect, the fact that evidence is prejudicial does not mean that it is necessarily unfairly prejudicial."  *State v. Rainey*, 198 N.C. App. 427, 433 (2009) (citations omitted).

In reviewing evidence of prior acts admissible under Rule 404(b), this Court's

Rule 403 inquiry has two elements. First, the Court must consider the probative value of the Rule 404(b) evidence. *Jones*, 288 N.C. App. at 185. This requires the reviewing court to "consider the similarities between the prior conduct and charged conduct." *Id.* (citation omitted); *see, e.g., State v. Magnum*, 242 N.C. App. 202, 213-14 (2015) (determining that the trial court did not abuse its discretion due in part to the "significant points of commonality between the Rule 404(b) evidence and the offense charged") (citation omitted).

Second, the Court must consider the danger of the evidence causing unfair prejudice. *Jones*, 288 N.C. App. at 185-86. Unfair prejudice, in the context of Rule 403, means "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, as an emotional one." *State v. Buchanan*, 288 N.C. App. 44, 48 (2023) (quotation marks and citation omitted). In the context of admitting Rule 404(b) evidence, this requires considering "whether the trial court 'carefully handled the process.'" *Jones*, 288 N.C. App. at 185 (brackets and citation omitted); *see, e.g., Beckelheimer*, 366 N.C. at 133 (determining that the trial court did not abuse its discretion due in part to its "careful handling of the process"). For example, the reviewing court shall examine whether the trial court "first heard the testimony of the 404(b) witness outside the presence of the jury to help rule on its admissibility; excluded testimony about any incidents without sufficient similarity; and gave limiting instructions to the jury." *Id.* (quotation marks and citations omitted).

Here, as discussed above, the evidence of Defendant's prior violent acts toward

Akira provides context surrounding the nature of Defendant's relationship with Akira and Marcus in the weeks leading up to the shooting. The evidence was also used by the State to show Defendant's motive, intent, and opportunity to use his gun to kill Marcus. As such, Defendant's prior violent acts toward Akira were probative.

Furthermore, the admission of this evidence was not unfairly prejudicial to Defendant. The trial court, aware of the potential danger of unfair prejudice to Defendant, exercised its due diligence by first hearing Akira's testimony regarding these incidents outside the presence of the jury. After considering the arguments made by both parties, the trial court conducted the proper balancing test required under Rule 403 to determine the evidence's admissibility. Accordingly, the trial court did not abuse its discretion by admitting the evidence of Defendant's prior violent acts toward Akira under Rule 403.

## C. The State's Closing Argument

Defendant next argues that a portion of the State's closing argument was an improper misstatement of the law. Specifically, Defendant contends that it was error for the State to argue, over objection, that the law of self-defense does not apply because Defendant shot an unarmed man.

"The standard of review for improper closing arguments that provoke timely objection from opposing counsel is whether the trial court abused its discretion by failing to sustain the objection." *State v. Jones*, 355 N.C. 117, 131 (2002) (citations omitted). Under this standard of review, this Court "first determines if the remarks

were improper." *Id.* Second, this Court determines "if the remarks were of such a magnitude that their inclusion prejudiced defendant, and thus should have been excluded by the trial court." *Id.* (citations omitted).

Prosecutors generally are "allowed wide latitude in argument to the jury and may argue all of the evidence which has been presented as well as reasonable inferences which arise therefrom." *State v. Guevara*, 349 N.C. 243, 257 (1998) (citation omitted). An incorrect statement of law in closing argument is improper. *State v. Ratliff*, 341 N.C. 610, 616-17 (1995). A prosecutor's misstatement of the law, however, "may be cured by the trial court's subsequent correct instructions." *Taylor*, 362 N.C. at 546 (citation omitted).

Here, the State argued to the jury that it was unreasonable for Defendant to believe that by shooting Marcus multiple times, he was protecting himself from imminent bodily injury or death. The State further argued, "Even if it is reasonable, the defendant never has a right to use excessive force." This statement is confusing at best.

Despite this statement, however, the State argued at length that Defendant's use of deadly force against Marcus was unreasonable. Furthermore, the State told the jury that the trial court would instruct them on the law of self-defense and, following the State's closing argument, the trial court instructed that

> A defendant does not have the right to use excessive force.
> A defendant uses excessive force if the defendant uses more
> force than reasonably appeared to the defendant to be

necessary at the time of the killing.

> It is for you, the jury, to determine the reasonableness of the force used by the defendant under all the circumstances as they appeared to the defendant at the time.

This instruction was proper.

Accordingly, the State's confusing statement, even if improper, was cured by the trial court's subsequent correct instructions, *Taylor*, 362 N.C. at 546, and the trial court did not abuse its discretion by failing to sustain the objection, *Jones*, 355 N.C. at 131.

## D. Evidence of Victim's Alleged Gang Involvement

Defendant argues that the trial court erred by refusing to allow evidence of Marcus' alleged gang involvement to be admitted. Specifically, Defendant argues that this evidence was relevant to show Defendant's state of mind during his altercation with Marcus. Defendant's argument is meritless.

A trial court's relevancy determination, although reviewed de novo, is still "given great deference on appeal." *Davis*, 237 N.C. App. at 485 (citation omitted). Any balancing done by the trial court pursuant to Rule 403 is reviewed for abuse of discretion. *Triplett*, 368 N.C. at 175. "Abuse of discretion occurs where the court's ruling is manifestly unsupported by reason or is so arbitrary it could not have been the result of a reasoned decision." *State v. Syriani*, 333 N.C. 350, 379 (1993) (citation omitted). Under this standard, "[r]eversal is appropriate only if the trial judge's ruling was outside the bounds of reason." *Buchanan*, 288 N.C. App. at 48 (quotation

marks and citation omitted).

"Evidence is relevant if it has any logical tendency to prove a fact at issue in a case, . . . and in a criminal case every circumstance calculated to throw any light upon the supposed crime is admissible and permissible." *Riddick*, 316 N.C. at 137 (citation omitted). The bar for evidence being relevant is low; "evidence is competent and relevant if it is one of the circumstances surrounding the parties, and necessary to be known, to properly understand their conduct or motives, or if it reasonably allows the jury to draw an inference as to a disputed fact." *Id.*

Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.C. Gen. Stat. § 8C-1, Rule 403. As stated above, unfair prejudice means "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, as an emotional one." *Buchanan*, 288 N.C. App. at 48 (quotation marks and citation omitted).

Here, Defendant attempted to introduce evidence that Marcus was involved with a gang through the testimony of Defendant's psychiatrist and a video allegedly showing Marcus making hand signals consistent with gang membership. The trial court determined that evidence of Marcus' alleged gang membership was irrelevant, and even if it was relevant, its probative value was substantially outweighed by the danger of unfair prejudice.

Even if relevant, we agree with the trial court that its probative value was substantially outweighed by the danger of unfair prejudice. Evidence that Defendant feared for his life because Marcus belonged to a gang does little to support his theory of self-defense, and such evidence would have had "an undue tendency to suggest decision on an improper basis." *Id.* The trial court's decision to exclude this evidence was not "so arbitrary that it could not have been the result of a reasoned decision." *Syriani*, 333 N.C. at 379 (citation omitted). Accordingly, the trial court did not abuse its discretion in excluding Defendant's evidence of Marcus' alleged gang involvement.

## III.    Conclusion

For the foregoing reasons, we find no error.

NO ERROR.

Chief Judge DILLON and Judge FLOOD concur.